The next case for argument is 16-2258 Cole-Kepro v. VSR Industries. Good morning, Your Honors. May it please the Court. John Artz on behalf of the appellant, Cole-Kepro. We're here appealing the Board's decision in an IPR proceeding finding all claims of the 814 patent invalid based on three separate grounds of obviousness. Can I ask you about that? This is just a process argument, which is unclear to me how many of these are independent. By my count, Runt is the only one that covers all the claims, including Claim 9, whereas the other obviousness determinations did not include Claim 9. That's exactly correct, Your Honor. The Board's findings of obviousness lack two things. They lack either rational underpinnings or they lack substantial evidence. In fact, on the substantial evidence issue, when you look at the evidence that the Board cites or the citations they use in their brief, they cite the petitioner's papers, whether it be the petition itself or the reply. If you go to the pages that the Board cites, there's no evidence submitted there, because petitioner didn't submit any. They rely, in some cases, on the actual teachings of the 814 patent itself, which we believe constitutes impermissible hindsight, particularly when you look at the actual evidence and teachings of the 814 patent that counsels against some of the proposed modifications that they're making. So we believe that the Board's decision in this case should be reversed in its entirety. There's some kind of global thing that isn't terribly helpful. I mean, why don't you give us some specifics? Yes. They certainly relied on the disclosures and what the disclosures said. Absolutely, Your Honor. The background of the 814 patent says at the time of the invention, and the Board acknowledged there were two types of gaming machines. There were video gaming machines and there were mechanical gaming machines, like a slot machine type. They're different. The background goes to great lengths to talk about that these require custom cabinets.     Each has to be custom-separated. Each has to be custom-separated. Each has to be custom-separated. They have different components, and because of that, they're extremely expensive. In fact, other than being gaming machines, they share virtually nothing in common. And this is set forth in Column 1, for example, Lines 38 to 41, Lines 45 to 48, and 46 through 50. With respect to the video game types, at the time, they took up a lot of space. They needed a significant depth to be able to accommodate the CRT video screens that were used at that point in time, so they took up valuable space on the gaming floor. It wasn't until the 814 patent came along and solved both of these problems. As to the video game, it took a flat panel display and mounted it to the inner surface of the door, which allowed the machine to be made significantly less depth, which allowed more of these to be placed on the casino floor, which is part of the reason of the extensive licensing that the board found to virtually every competitor in the industry. So let's talk about Round 1, which is Fraley. Fraley is a non-videotype machine, of a non-videotype set forth in the background. It has a display, but as the board found it... Well, that's usually true. I mean, when we're in an obvious determination, we're looking at combining several references, and that's precisely what the board did here. It relied on Fraley for teaching a static display attached to a cabinet door, and then it relied on other references for the portions you needed. So I guess I'm not really understanding what you're telling us. So what I'm telling you, Your Honor, is the board said it'd be obvious to take a video display and substitute it for the non-video display in the non-video gaming machine, basically transforming what was, as the background of the patent sets forth, transforming an electronic gaming machine that is custom-made differently at the outset. You're choosing one of two machines, which the background teaches are two separate paths. And the board said it would be obvious to take a video display and substitute it for a non-video display, and what's the result going to be? You're still going to have a mechanical game with a video... This isn't an anticipation objection. You've got a bunch of pieces. You've got a bunch of old pieces. Isn't this like KSR, this motivation to try to improve devices, and so you add an LCD and you've got the window and the door? But Your Honor, I would suggest that that's hindsight, and the reason being is if the non-video game that was selected at the beginning to not be a video game, it's not like today when video games were introduced that suddenly the non-video games have gone away. They're still there. There's two separate markets. You've got the non-video, the slot machines, and then you've got the video. Why don't you tell us about commercial success? The board tossed that aside and said you don't have corroborative evidence, and in fact, it said the commercial success was de minimis. The amount of money you were bringing was de minimis. On the commercial success, it did, but what the board did find is it credited that the 814 patent had been licensed to virtually the entire industry, and VSR doesn't challenge this. Yeah, but it was sort of stifled in terms of where that took them because didn't they find just one of them was specific to the 814 patent, and so yes, there are licenses, but we don't know the breadth of those licenses and how much of a part 814 played. I think what the board said, Your Honor, is all the licenses were not exclusively for the 814 patent, so all of the licenses licensed the 814 patent, but it also licensed in a proportion, but nonetheless, in connection with the declaration of Mr. Cook, the vast majority of the industry has taken a license under the 814 patent with the upfront payments that are part of these licenses exceeding about $2.6 million. Yeah, but what are we to do with that evidence? I mean, because if the license covers multiple patents, how will you, did you put forth any of the 814 patent laws? There was no evidence put forth to value one versus the other, but the board found and credited that this was evidence that needs to be taken into account when evaluating the issue of obviousness, but what it did find, they found in this case, they believed it was a strong case of obviousness, and so because there wasn't the nexus, it wasn't sufficient to overcome, but as we've set forth in our brief, we don't think that there's any evidence of obviousness, but certainly not strong, because there's no testimony from a person of ordinary skill in the art, there's no express motivation in any of the references to make the purported modifications or combinations that they discuss, so to the extent that there's any obvious, we don't believe it's a strong case, and then as this evidence exists, it should be sufficient to overcome whatever obviousness exists. Is that a factual question? You know, if the PTAB says that certain factors, like the fact that the license covers many different patents, that that diminishes the weight that should be accorded to that evidence, we review that for substantial evidence, right? Yes, Your Honor. Okay, what about the analysis of whether the commercial success outweighs the evidence of obviousness? That's an obviousness, that's a question of fact, too. That is also a question of fact, Your Honor. Do you have a case that says that? I mean, the ultimate, we all know the ultimate, there are certain things that are questioned are fact, there's site fights that appear in all the cases about underlying questions of fact, and then there's the ultimate question of law and obviousness. Do you have a case that says that the weighing, I mean, genuinely, I don't know that the weighing is not, if it's the ultimate determination of obviousness, why isn't the weighing illegal versus? Well, I think, as you explained it, I think it would almost have to be, is if you're making the underlying, a question ultimately goes into the overall question of law, as to what is obvious, obviousness being a question of law predicated on underlying facts, and if one of the underlying facts is the commercial success, then that fact has to be taken into when you're analyzing to determine whether or not there's the ultimate question of obviousness as a matter of law. I believe that. In other words, that which might appear to be obvious when you look at a bunch of references may be shown not to have been obvious when you look at commercial success. That's correct. Yes, that's correct. If I would like to jump to the second ground, which is Runty, and Runty, what the board essentially, Runty is a tabletop. What the board found is that Runty was obvious because, and what we're challenging is, is the board found that if you substituted a flat panel display for the CRT display, and the display in Runty is attached horizontally to the tabletop, the board found that it would be obvious if you substituted that, that you could decrease or have a reduced depth dimension. But the reduced depth dimension that the board was focusing on was height. If you decrease and change and substitute an LCD display, which as we set forth in our brief, we don't think is proper, but substitute it for a CRT, all you've done is decrease the height of the cabinet. If you look specifically at what Claim 8 requires, the reduced depth dimension in Claim 8 and also Claim 4 is predicated on the cabinet having a front, back, and two sides, and it says that the cabinet has a width from said first side to said second side, which exceeds a depth of said cabinet from said front to back. So what the claim is concerned about is the depth of the device from front to back, because the door is on the front of the device, and when you open the door, it allows access to the interior, and it's decreasing that depth front to back as compared to the width. The board didn't address that. The board ignored that claim language when it said that when you decrease the height of Runty, they said that that met the claim limitation. I guess I'm not entirely clear. Runty is the table, so the front and the back of the cabinet, couldn't that be the top and the bottom of the table? The Runty, the board and petitioner agree that the top of Runty is the top, and so it's got the top, bottom, sides. No one has made the position that the top of Runty is the front, because it just can't be, because you're talking about the depth front to back as compared to side to side. I'd also like to address Claim 9 of Runty. The board erred in also finding Claim 9 obvious. Claim 9 requires a bracket mounted to the door, and it requires that the bracket have a horizontal support structure on which the lower edge of the display rests, and the claim specifically says that the lower edge of the display rests on this bracket when the display is connected to the door. If we agree with you that commercial success is shown by licensing, which claims would that affect? The evidence I believe that is in the declaration of Mr. Cook applies specifically to Claims 1 and 8. It talks about the feature that customers were specifically requesting and speccing and why they felt that they needed to enter and get rights under the 814 patent related to a cabinet having reduced depth and a screen mounted to the inside of the door. So specifically Claim 8. With respect to Claim 9, Your Honor, VSR in its petition never asserted that Runty taught the bracket of Claim 9. Never asserted in its petition, never asserted in its reply. It merely said it was obvious. Yet the board still found that Runty taught a bracket having a horizontal support because when the Runty lid was raised, the CRT display would rest, the lower surface would rest on this bracket. But when the door is closed, it's not resting on a horizontal surface. So in all positions, it's not resting on a horizontal surface as is required by the claim. Whereas if you look at the 814 patent, when the door is on the front, as the claim requires, Claim 8, and it is moved from an open position to a closed position, the display is always resting on the horizontal support surface, which is not present in Runty. The board erred in that regard in ignoring that limitation. Okay, you're into your rebuttals. Oh, thank you, Your Honor. I'll reserve thank you. Thank you. Good morning, Your Honors. Adam Yow for Pele Petitioner VSR with Ms. Michael Runtsvay. I think an appropriate place to start is with the standard of review, which is substantial evidence. Can you speak up a little bit? Oh, yes, I'm sorry. I think an appropriate place to start is the standard of review, particularly in respect to every single argument I believe raised by appellants is under the substantial evidence standard at a minimum. And the reason I say at a minimum is because the testimony of witnesses, particularly their attributed a somewhat higher standard even than substantial evidence. Mr. Yow, I want to ask you about licensing. The board said that the revenue was de minimis. Well, I look at the declaration, and I see a one-time payment of a quarter of a million dollars, an upfront payment of a quarter of a million dollars, another one of three million dollars, all involved, all compensation for licensing this patent. Why doesn't that overcome any otherwise presumption of obviousness from all of these references? Well, Your Honor, there are a couple layers to that. First of all is that the board didn't just say it was de minimis. Mr. Cook, who is their sole support of any sort of background on these licenses, Mr. Cook said it was de minimis. And that's the value of the machine to which the 814 patent is licensing. And that, I think, Your Honor, is very important because the thing that you're looking for with nexus is some sort of independent recognition that this is important. And if you're talking in de minimis sum, then you're not talking independent recognition that this invention is important. You're talking — Well, where did he say that it was de minimis? Mr. Cook? Mr. Cook. It was his declaration, right? It was his deposition that said it was de minimis. One moment, Your Honor. Hundreds of thousands of dollars. I don't know the gaming business, of course, but hundreds of thousands of dollars, a million dollars doesn't sound de minimis to me. Yes, Your Honor. Real quick. Page 23 of our red brief has that cite to the de minimis at the bottom. It would be at the Cook deposition, page 37, line 16 through page 38. Do you want to do it with the J.A. page? Oh, sorry. It's 637 through 638. Again, Your Honor, I think that we need to look at what the de minimis means in context. IGT specifically is brought up a lot because they're the largest gaming manufacturer. A million dollars may sound like a lot, but you're talking a hundred thousand. I'm looking at your red brief, Mr. Cook, admitted that the $20 per unit royalty was de minimis. But it's a matter of business arrangements between the parties, whether you pay per unit or up front. Yes, Your Honor. That comment related to per unit rather than up front payments. But it's quite easy to translate in this situation, Your Honor, because we have that sort of information between Mr. Cook's deposition and his declaration. This is specifically for Bally. If you look at IGT, which Mr. Cook represents approximately 75% of the market or somewhere in that range, then the numbers go way up. You're talking maybe 100,000 gaming machines per year at 20 grand apiece. That's $20 million per year. So if you want to look at the lump sum payment of $1.6 million over a 20-year span of this patent, that is de minimis. That's $400 million versus 1.6. It's barely a percent. And I believe it's well less than the cost of any reasonable patent litigation, at least as they occur today. So I do think that's de minimis. I think the Board made that finding. I think it's a factual finding that is subject to substantial evidence and is absolutely supported by substantial evidence. Mr. Arts suggested that nobody has argued that the table top of Runty is the front as required by the claim. Is that right? I don't agree with that, Your Honor, no. And there's a couple problems with that. Number one is that the claim never recites a top and a bottom. It just says sides of front and the back. So it is ambiguous as to whether or not there is a top and a bottom or whether or not the front can be the top or the bottom, especially in a PTAB review with an unexpired patent when you're talking about the broadest reasonable interpretation. And again, as the PTAB correctly notes, there were no specific claim constructions argued by either party on this front. But I do believe that the PTAB at least implicitly recognized that the top of Runty is the front of the 814 patent as recited. And that was the position that you took? That was the position that we took, and that is a position I believe the PTAB adopted, and I believe they did so correctly. Particularly when you look at it sort of pragmatically, even Mr. Art said the front is where the display goes, and that's where the display is in Runty. It makes a great deal of sense, I believe. In their reply brief on appeal, they try to argue that side 32 of Runty is the front, which doesn't make much sense to me because Runty is a hexagonal shape for multiple players around the table. It's kind of arbitrary that they picked one because that means somebody is playing from the back, and that makes no sense. If you say the top of Runty is the front of the 814 patent, it all makes sense. That's where the display is. That's where everybody's looking, and you meet 814 independent claims very easily. I believe in general their obviousness arguments are dated in that in many instances, it would seem that Mr. Arts would prefer that KSR didn't exist, and a number of their cases are pre-KSR, and their arguments are pre-KSR. We do not require an expert for IPRs. It's very well established, especially with simple art such as this, and there's no need for an express teaching suggestion or motivation in the art. We have very well-documented evidence and very strong evidence of a motivation here. LCDs had recently come out. They were known in the art as Mr. Arts admitted at the trial before the PTAB, and they have well-known benefits. The 814 patent expressly talks about the benefits of the LCD, which they did not invent. They did not even invent the use of LCDs in a gaming machine. We get to rely upon that, their statement of the prior art and what the benefits of known components in the prior art achieve by their inclusion. We get to rely upon that, and that's what we did rely upon. It provides a very strong motivation to go straight from Fraley, Runty, or Smith directly to the 814 patent. I'd like to move to Runty. I'm sorry. The Runty reference is the only one that goes to Claim 9, correct? Yes, Your Honor. To answer, I believe, what your first question was, the independent claims are Claims 1 and 8. Claim 9 is the only one that recites this bracket support arrangement, and Claim 2 is slightly similar in that it involves the use of a mount. But yes, Runty was the only one that was found to invalidate Claim 9, although Smith and Fraley plus Okada were argued for that purpose. Your Honors, unless there's any further questions, I think that's all I have. Thank you. Thank you. I think I just have two points, Your Honor. The first is that, as Your Honor noticed, the de minimis related to the amount of the royalty rate. The upfront payments in terms of the licenses were well over $2.6 million. In terms of royalty that was given based on what the licenses are that are in the record. It doesn't include whatever subsequent royalty payments that would have been made for the terms of the license agreement. And as to the issue with Runty, I refer to the court to the petition filed below, and this is Appendix 674, talking about Claim 5, which relates to whether that relates to the door being on the front of the cabinet. It would also apply with respect to Claim 8. It says, Runty discloses that the door is located at the top of the cabinet. This is their quote, the first sentence with respect to Claim 5. It would have been known to one of ordinary skill in the art that the Runty device could be oriented in the traditional fashion, i.e., as an upright console. But that's directly against the teachings of Runty that says our tabletop is against, than a console because people can't keep their drinks there and would have to leave their belongings and go to the console. I see my time is up. Can I make one more point? Yes. And that is, as to Runty, the board didn't address that last point. Despite petitioner conceding that Runty has a top and the depth is from top to bottom, that's all the board found. It didn't go any further with respect to the language of the claimant. Thank you, Your Honor. We thank both sides. The case is submitted.